# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

      Plaintiff,

v.

Sylvestre Martinez Guzman (01), and
Amaury Medina-Medina (02),

      Defendants.

Criminal No. 09-234 JMR/SRN

**REPORT AND RECOMMENDATION**

---

      David Steinkamp, Esq., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

      Robert Davis, Esq., Robert G. Davis Law Office, 270 North Grain Exchange Building, 301 Fourth Avenue South, Minneapolis, Minnesota 55415, for Defendant Sylvestre Martinez-Guzman.

      Andrew Garvis, Esq., Koch & Garvis, 3109 Hennepin Avenue South, Minneapolis, Minnesota 55408, for Defendant Amaury Medina-Medina.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

      The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant Martinez Guzman's (01) Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 47], Motion to Sever Counts and Defendants [Doc. No. 49], and Motion to Suppress Statements, Admissions, and Answers Made by the Defendant [Doc. No. 50][1]; and Defendant Medina-Medina's (02) Motion to Suppress Evidence Obtained as a Result

---

[1] The only basis for Defendant Martinez's motion to suppress statements is that any statements were the result of the traffic stop and searches he challenges as unconstitutional. As set forth below, this Court concludes that the stop and searches were constitutional and therefore, Defendant Martinez' Motion to Suppress Statements, Admissions, and Answers Made by the Defendant [Doc. No. 50] should be denied.

of Search and Seizure [Doc. No. 53], Motion for Severance of Counts and Defendants [Doc. No. 54] and Motion for Severance of Defendants [Doc. No. 68]. This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. [2]

## I.    BACKGROUND

The Government filed an Indictment against Defendants Sylvestre Martinez Guzman (Martinez), Amaury Medina-Medina (Medina), and Candelario Ponce-Ramirez on August 20, 2009, charging all Defendants with Conspiracy to Distribute and Possess with Intent to Distribute and Aiding and Abetting Possession with Intent to Distribute [Doc. No. 39]. Specifically, the Indictment charges that from an unknown date until July 2009, Defendants possessed and intended to distribute 50 grams or more of methamphetamine.

This Court held a pre-trial motions hearing on October 7, 2009. St. Louis Park Investigator Terry Reuvers and Minnesota State Trooper Kevin Kloss testified at the hearing on behalf of the Government. The Court received two exhibits into evidence – Government Ex. 1: Search Warrant, Application for Search Warrant, and Supporting Affidavit for a Black Ford Explorer, MN License #VMT-901, and Government Ex. 2: Event Chronology. This matter is set for trial before United States District Judge James M. Rosenbaum.

## II.    FACTS

Investigator Terry Reuvers is an officer with the City of St. Louis Park and a member of the Northwest Metro Drug Task Force. Investigator Reuvers has been a law enforcement officer for 24 years and has spent a combined total of nine years on the drug task force.

---

[2] The Court has addressed Defendants' non-dispositive motions in a separate Order.

On the evening of July 22, 2009, around 9:15 p.m., Investigator Reuvers was working with Sergeant Hunt, the supervisor of the Northwest Metro Drug Task Force. While patrolling, Sergeant Hunt received a call from Plymouth police officers indicating they had conducted a traffic stop of a suspicious vehicle. From their Golden Valley location, Investigator Reuvers and Sergeant Hunt then proceeded to the location of the traffic stop, near Highway 169 and 36th Street in Plymouth.

At the scene, Investigator Reuvers and Sergeant Hunt spoke to the driver of the vehicle, Carlos Sarabia-Ferrel. After he was taken into custody, Mr. Sarabia-Ferrel told the officers that there was approximately $14,500.00 in cash located in the dashboard of his vehicle. During the search, this fact was verified and officers uncovered approximately $14,500.00 in cash in the dashboard.

Mr. Sarabia-Ferrel then told Investigator Reuvers and Sergeant Hunt about other individuals who were involved in drug trafficking activities. Specifically, Sarabia-Ferrel stated that he was aware that a black Ford Explorer with Minnesota plates and 22-inch tires would be driving from Minneapolis to Reno, Nevada that night. He further explained that the vehicle would be driven by two or three Hispanic males and the vehicle would contain drugs and large amounts of cash hidden in the dashboard. Mr. Sarabia-Ferrel explained that the car would have an after-market button installed to open a hidden compartment in the dashboard. Finally, Sarabia-Ferrel explained that the vehicle was possibly owned by Defendant Ponce-Ramirez and it would be leaving from the address of 3637 4th Street in south Minneapolis. Mr. Sarabia-Ferrel was aware of this information from his own drug selling activities in the same drug trafficking scheme and from a close friend who was associated with the 4th Street address. He also had personal knowledge about the vehicle. As Investigator Reuvers testified at the hearing, "And

[Mr. Sarabia-Ferrel] had seen this vehicle before and was aware of the vehicle being involved in the trafficking of narcotics. He had actually seen the trap in the vehicle, the hidden compartment being opened in the past, so he was aware of where the drugs and money would be hidden."

The officers then drove Sarabia-Ferrel to the address from which the black Explorer would reportedly be leaving. While the officers drove around the house, Mr. Sarabia-Ferrel indicated that the Explorer would be located in the residence's garage. After Investigator Reuvers and Sergeant Hunt positioned themselves to watch the house, the officers called in other task force officers to conduct surveillance. Once the additional task force officers arrived, Investigator Reuvers and Sergeant Hunt left the house to take Sarabia-Ferrel into custody at the Plymouth police department. Reuvers and Hunt were at the 3637 4th Street address for approximately 20-30 minutes.

After Investigator Reuvers and Sergeant Hunt left the house, the other task force officers continued their surveillance and planned to follow the black Explorer if it left the garage. Later, Investigator Reuvers and Sergeant Hunt were advised that the Explorer had left the residence and driven onto Interstate 35W heading south. Constant surveillance was maintained on the Explorer as it traveled south on 35W. After getting into their vehicle to attempt to catch up with the Explorer, Officers Reuvers and Hunt contacted the state patrol to seek assistance in stopping the Explorer. The officers provided the state patrol dispatch the license and registration of the vehicle and said they believed the vehicle was carrying drugs and cash hidden in the dashboard. Eventually Investigator Reuvers and Sergeant Hunt caught up with the Explorer in the area of 35W and Highway 13 in Burnsville.

Minnesota State Trooper Kevin Kloss received the call from dispatch regarding the Explorer around 1:48 a.m. on the morning of July 23, 2009. Trooper Kloss has ten years of

experience in law enforcement. On the date of the stop, Trooper Logering, a newer trooper, was riding with Trooper Kloss for training and observation purposes. Dispatch indicated the color, make, model, and license plate of the target vehicle, as well as information that the vehicle was likely carrying drugs and cash hidden in the dashboard.

When Trooper Kloss came upon the Explorer, he observed it passing another vehicle in the left lane at a speed that appeared to be in excess of the posted limit. Therefore, Trooper Kloss used his radar gun and clocked the Explorer at 77 mph in a 70 mph zone. After activating his squad car's lights, Trooper Kloss stopped the Explorer around the 71 or 72 mile marker of 35W near Lakeville around 2:02 a.m. Defendant Martinez, the driver of the Explorer, pulled over to the right shoulder. Investigator Reuvers and Sergeant Hunt observed Kloss stop the Explorer and they, in turn, stopped approximately one city block behind the state patrol car. The task force officers called the state patrol dispatch and notified them of the stop. At that time, Sergeant Hunt also called for a canine unit to conduct a drug search.

Trooper Kloss approached the vehicle on the passenger's side where Defendant Medina was sitting. Without any display of force or intimidation, Trooper Kloss asked Defendant Martinez for his license and registration. While obtaining the license, Kloss asked Martinez basic questions about where he was coming from and where he was going. In reply, Defendant Martinez stated that he was coming from Minneapolis and was headed to Reno. When Trooper Kloss received the car's proof of insurance, he noted it was in the name of Ponce-Ramirez, not the driver-Defendant Martinez. After Trooper Kloss questioned why Martinez and Medina were driving Ponce-Ramirez's car, Defendant Medina stated that Ponce-Ramirez had flown to Mexico and asked Martinez and Medina to drive the car to Nevada.

Next, Trooper Kloss asked Defendant Martinez to step out of the car. Defendant Martinez complied and met Trooper Kloss at the back of the vehicle between the Explorer and the squad car. At that time, Trooper Kloss advised Defendant Martinez that he had stopped the vehicle for speeding and Martinez admitted he was driving too fast. In order to separate Defendant Martinez from Defendant Medina, Trooper Kloss placed Martinez in the back of the squad car.[3]

While Trooper Kloss was reviewing Defendant Martinez's license information, Defendant Martinez indicated he had spent the last two months working in construction in Minneapolis and he was going to Reno because work in Minnesota had slowed. While Defendant Martinez was still in the squad car, Trooper Kloss returned to the Explorer and asked Defendant Medina from where he was coming. Defendant Medina stated that he and Defendant Martinez had been in Minneapolis for the last week but were returning to Reno because work was slow in Minnesota. Trooper Kloss then went to speak to Sergeant Hunt and Investigator Reuvers. Trooper Kloss provided Sergeant Hunt with the information he had obtained from the Explorer's occupants, including the discrepancy between the Defendants' stories regarding how long they had spent in Minnesota. In response, Sergeant Hunt explained that the Explorer was the target vehicle and reiterated that the vehicle was likely carrying drugs and cash in the dashboard.

Trooper Kloss then returned to the squad car and issued Defendant Martinez a written warning for speeding. Trooper Kloss also asked Defendant Martinez if anyone had ever asked him to haul drugs, but Defendant Martinez did not respond. Next Trooper Kloss asked if there

_____

[3]  All Minnesota State Patrol squad cars are equipped with video recording equipment that turns on automatically when a trooper activates the car's lights. While the stop at issue in this case was recorded, the government is unable to locate the recording at this time.

was any cash in the car and Martinez answered that his cash was in his pocket. Finally, Trooper Kloss asked Defendant Martinez what items in the vehicle specifically belonged to him. Defendant Martinez replied that he had clothing and construction tools in the vehicle. Trooper Kloss then let Defendant Martinez out of the vehicle and told Martinez he was free to leave.

As Defendant Martinez started to walk to his car, Trooper Kloss asked "do you mind if I ask you any other questions?" In response, Defendant Martinez stopped, turned around, and looked at Trooper Kloss. Trooper Kloss asked if Defendant Martinez had any weapons in the car, to which Defendant Martinez replied "no." Next Trooper Kloss asked if there were large sums of cash in the car. In response, Defendant Martinez replied "diñero?" which this Court understands to be a Spanish word for money. Trooper Kloss affirmed that he was talking about "diñero," and Defendant Martinez responded that his money was in his pockets. Then Trooper Kloss asked if there were any drugs in the Explorer. Defendant Martinez chuckled and responded "no." Finally, Trooper Kloss asked if Defendant Martinez minded if officers looked in the vehicle. Defendant Martinez responded "sí" and Trooper Kloss verified that Defendant Martinez meant, yes, the officers could look in the vehicle.

Having received Defendant Martinez's consent, Trooper Kloss searched the vehicle. He first asked Defendant Medina to step out of the vehicle and had both defendants stand on the side of the road near the front of the squad car. At that time, Investigator Reuvers and Sergeant Hunt exited their vehicle and walked to where the defendants were waiting. While Trooper Kloss searched the Explorer, Investigator Reuvers spoke to Defendant Martinez while Sergeant Hunt spoke to Defendant Medina. Neither Defendant was cuffed at that time and the task force officers simply made small-talk with the defendants while they waited for the search to finish. The officers discussed matters such as the weather, the job markets in Minneapolis and Reno,

Minnesota winters, and the like. Defendant Martinez indicated that he and Defendant Medina were returning to Reno to find work because of the poor job market in Minnesota. Both defendants responded to the investigators appropriately and did not give Investigator Reuvers any reason to believe the defendants did not understand or speak English.

During the search, Trooper Kloss opened the vehicle's glove compartment and observed metal spot-welded to the top of the compartment. Based on his drug interdiction training, Trooper Kloss believed the welding was significant because aftermarket modifications to a glove compartment are often a sign that drugs or drug trafficking materials are hidden in the dashboard. Additionally, there was an after-market button installed on the driver's side of the car as Sarabia-Ferrel indicated would be the case. The law enforcement officers did not press the button until after a search warrant was obtained.

As Trooper Kloss finished the search of the vehicle and approximately 15 minutes after the stop was initiated, Officer Topp of the Plymouth Police Department arrived at the scene with K-9 dog Sabre. The dog alerted to drugs at the doors on both sides of the car, as well as the dashboard of the car. In fact, the dog jumped into the car through the open passenger door window and damaged the dashboard trying to chew into the area. Based on the canine search, both Defendant Martinez and Defendant Medina were taken into custody and placed in the back of the squad car. Trooper Kloss transported the defendants to the Plymouth police department. Deputy Grabau from the Hennepin County Sheriff's Office drafted an application for a search warrant based on the information observed in the stop and search. Neither Trooper Kloss nor Investigator Reuvers participated in the drafting of the search warrant application.

## III.    DISCUSSION

Defendants[4] argue that the traffic stop of their vehicle was unconstitutional because:  (1) the true purpose of the stop was to search for drugs; (2) the loss of the videotape of the stop violated the defendants' due process rights; (3) the expansion of the stop to ask drug-related questions and obtain a canine search was without reasonable suspicion and was too lengthy; (4) the consent given by Defendant Martinez to search the vehicle was not voluntary; (5) Trooper Kloss' search of the vehicle without a warrant was unconstitutional; (6) the canine search of the interior of the vehicle was unconstitutional; and (7) the search warrant contained a material misstatement.   The Government responds that:  (1) officers conduced a valid Terry stop; (2) officers had reasonable suspicion to expand the scope of the stop; (3) the loss of the videotape of the stop was not intentional but accidental; (4) suppression of evidence is not the remedy for any due process violation; (5) Defendant Martinez's consent was voluntary; (6) all the searches were supported by probable cause; and (7) a Franks hearing is not necessary.

### A.    Trooper Kloss Had Reasonable Suspicion for the Traffic Stop.

Defendants contend that the initial stop of the defendants' vehicle was unconstitutional because the reason for the stop was contrived and the real reason for the stop was to search for narcotics.  This Court disagrees.

The Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  A traffic stop or investigatory detention constitutes a seizure within the meaning of the Fourth Amendment.  United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004) (citing Delaware

---

[4]  Defendant Amaury Medina-Medina (02) submitted a post-hearing brief regarding his motions on October 28, 2009 [Doc. No. 84].  Defendant Sylvestre Martinez Guzman (01) has moved to adopt the arguments of Mr. Medina-Medina [Doc. No. 86] and this Court has granted that motion in the accompanying Order.

v. Prouse, 440 U.S. 648, 653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)).  An investigatory detention, which is a brief seizure by police based on a reasonable suspicion of criminal activity, is a narrow exception to the Fourth Amendment's probable cause requirement.  Terry v. Ohio, 392 U.S. 1, 26-27 (1968); United States v. Stigler, 574 F.3d 1008, 1010 (8th Cir. 2009).  The officer must have a reasonable, articulable suspicion of criminal activity in order to conduct the investigatory detention, which has become known as a Terry stop.  Id. at 21-22.  The officer may also perform a limited pat-down search for weapons if the officer believes the person is armed and dangerous.  Id.  A reasonable, articulable suspicion means that there are specific and articulable facts, and rational inferences drawn from those facts, reasonably suggesting that criminal activity has occurred or is imminent.  Id. at 21.

Any traffic violation, however minor, creates probable cause to stop a vehicle.  United States v. Binion, 570 F.3d 1034, 1038 (8th Cir. 2009); United States v. Arciniega, 569 F.3d 394, 397 (8th Cir. 2009).  "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  Arciniega, 569 F.3d at 397 (citing Whren v. United States, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L.Ed.2d 89 (1996)).  Once an officer has probable cause to stop a vehicle, "the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant."  Id. (citing United States v. Bell, 86 F.3d 820, 822 (8th Cir. 1996)).  Likewise, it is also irrelevant that the officer may have ignored the violation if the officer did not suspect the possibility of a greater crime.  Id. (citing United States v. Luna, 368 F.3d 876, 878 (8th Cir. 2004)).  During a lawful traffic stop, it is permissible for an officer to check the driver's license and registration, ask the driver about his destination and purpose, and request that the driver sit inside the patrol car.  United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008) (citing United States v. Brown, 345 F.3d 574, 578 (8th Cir. 2003)).

While Trooper Kloss may have been looking for a reason to stop the defendants' vehicle because of the information that the vehicle was transporting narcotics, this fact is not dispositive. Trooper Kloss had probable cause to stop the vehicle based on his observation that Defendant Martinez was driving in excess of the speed limit.[5] Therefore, the traffic stop of the defendants' vehicle did not infringe on their rights under the Fourth Amendment and the Court recommends that the motions to suppress be denied.

### B.      Defendants' Due Process Rights Were Not Violated.

Defendants acknowledge that a "contrived" or pretextual reason for a stop does not violate any constitutional principal. (Defendant Medina-Medina's Memorandum of Law [Doc. No. 84] at 7). Nevertheless, Defendants assert that the search should be suppressed because "the entire stop and interaction must be considered unconstitutional when considering the false statements either on the stand or in the application for the search warrant, coupled with the unexplainable loss of the video/audio tapes." (Id. at 8). Defendants' argument fails for a number of reasons.

A defendant's due process rights are violated if the government suppresses or fails to disclose "*material exculpatory evidence*." United States v. Houston, 548 F.3d 1151, 1155 (8th Cir. 2008) (citing Illinois v. Fisher, 540 U.S. 544, 547, 124 S. Ct. 1200, 157 L. Ed. 2d 1060 (2004)) (emphasis supplied). If, however, the evidence is not clearly exculpatory and instead is merely "potentially useful," then the defendant must establish bad faith on the part of the police to establish a due process violation. Id. (citing Arizona v. Youngblood, 488 U.S. 51, 57, 109 S.

---

[5] Defendants argue that, because the traffic stop occurred outside of a municipality, evidence they were driving in excess of 70 miles per hour is only prima facie evidence that the speed was not reasonable or prudent under the circumstances. See Minn. Stat. § 169.14, subd. 2(a). It is immaterial whether the basis for the stop was the fact the defendants were violating the posted speed limit or because the defendants were driving at a speed that was not reasonable or prudent. Either traffic violation would provide probable cause to stop the vehicle.

Ct. 333, 102 L. Ed. 2d 281 (1988)). In Houston, the defendant argued that his due process rights were violated because the officers failed to preserve videotape evidence of a traffic stop that led to the defendant's narcotic's arrest. The court held that the defendant was required to show bad faith on the part of the officer to establish a due process violation because the court concluded the videotape presented "potentially useful" evidence not exculpatory evidence.

As in Houston, because there is no evidence that the videotape at issue in this case contains exculpatory evidence, the defendants must establish that Trooper Kloss acted in bad faith by not preserving the videotape. Defendants have not made this showing. Rather, Trooper Kloss testified that he secured the videotape after the stop and preserved the tape in his normal course. Since that time, the videotape has become lost. There is no evidence to suggest that the videotape was destroyed or lost in bad faith. Therefore, Defendants have not established a violation of their due process rights.

**C.      The Expansion of the Scope of the Stop Was Valid.**

Once an officer has stopped a vehicle pursuant to Terry, "[t]he officer may ask the detainee questions in order to dispel or confirm his suspicions, but questioning is limited in scope to the circumstances that justified the stop." United States v. McGauley, 786 F.2d 888, 890-91 (8th Cir. 1986); Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984) ("The [Terry] stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detained a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"). During an investigatory detention, an officer must employ the least intrusive means of detection reasonably necessary to address the officer's reasonable suspicion. Gill, 513 F.3d at 845; United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999). Asking questions related to the

reasonable suspicion and seeking consent to search the vehicle are minimally intrusive and "reasonable and permissible methods of continuing the investigation that [do] not unduly prolong a detention." Gil, 513 F.3d at 845.

An officer may expand the scope of a Terry stop if the officer has reasonable, articulable suspicion that the person is engaged in criminal activity. United States v. Binion, 570 F.3d 1034, 1039 (8th Cir. 2009); United States v. Gil, 513 F.3d 836, 844 (8th Cir. 2008); United States v. Long, 320 F.3d 795, 800 (8th Cir. 2003). To expand the scope of the stop, "[t]he officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." Binion, 570 F.3d at 1039 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). In such instances, the officer may then broaden the scope of the stop and satisfy his or her reasonable suspicions without violating the Fourth Amendment, including asking questions unrelated to the original traffic stop. Gil, 513 F.3d at 844; United States v. Hogan, 539 F.3d 916, 921 (8th Cir. 2008); United States v. Jones, 269 F.3d 919, 926-27 (8th Cir. 2001). Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances. Gil, 513 F.3d at 844; Binion, 570 F.3d at 1039; United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002).

Trooper Kloss had a reasonable, articulable suspicion that the defendants might be engaged in criminal drug activity. Trooper Kloss knew from dispatch and his subsequent conversation with Investigator Reuvers and Sergeant Hunt that the vehicle was likely carrying drugs and cash hidden in the dashboard. Further, Trooper Kloss' suspicions of drug activity increased based on the discrepancy between the defendants' stories regarding how long they had been in Minnesota. Defendants contend that the information known to Trooper Kloss was not sufficient to support a finding of reasonable suspicion because the information was not based on

Mr. Sarabia-Ferrel's personal knowledge. However, the record establishes that Mr. Sarabia-Ferrel provided information to the officers based both on his personal knowledge and information from another individual who was involved in the drug trafficking scheme. Furthermore, officers corroborated much of the information provided by Mr. Sarabia-Ferrel before the traffic stop. The totality of this information provided Trooper Kloss with sufficient reasonable suspicion to expand the scope of the traffic stop to ask questions of the defendants about transporting narcotics and money and the Court recommends that the motions to suppress be denied.

### D. The Delayed Detention for the Dog Sniff Was Reasonable.

Defendants assert that the detention while officers waited for a canine sniff was too lengthy. A delayed detention to wait for a canine search may become an unconstitutional seizure, if the traffic stop is unreasonably prolonged before the dog is employed. United States v. Lyons, 486 F.3d 367, 372 (8th Cir. 2007); Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005). As the Eighth Circuit has explained, the length of a permissible delay must take into consideration the circumstances of the stop, "[w]hen police need the assistance of a drug dog in roadside Terry stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times. Courts must consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994); see also United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005). Short delays to obtain a canine search do not unreasonably prolong a detention. United States v. Donnelly, 475 F.3d 946, 953-54 (8th Cir. 2007) (upholding hour delay to wait for a drug dog to respond to a traffic stop);

<u>Maltais</u>, 403 F.3d at 556 (holding delay of nearly three hours to wait for canine sniff was reasonable because of remote location of stop and fact stop occurred in the middle of the night); <u>United States v. Bloomfield</u>, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (holding one hour delay to wait for canine sniff upon reasonable suspicion was reasonable); <u>United States v. White</u>, 42 F.3d 457, 460 (8th Cir. 1994) (concluding detention for one hour and twenty minutes was reasonable when officer acted diligently in obtaining the drug dog and delay caused by remote location of nearest dog).

The delay in the detention of the defendants in this case while officers were waiting for the canine unit was reasonable. Both Trooper Kloss and Investigator Reuvers testified that the canine unit arrived approximately fifteen minutes after the stop was initiated. The officers did not delay in obtaining a canine unit and in fact the process for obtaining a canine search began even before the vehicle was stopped. As set forth above, the officers had reasonable suspicion, if not probable cause, to believe the vehicle contained evidence of drug trafficking. A fifteen minute delay to conduct a canine search to confirm or dispel those suspicions was reasonable and not unduly prolonged and therefore, this Court recommends that the motions to suppress be denied.

      **E.**     <u>**The Vehicle Search by Trooper Kloss Was Permissible Under the Fourth Amendment.**</u>

Trooper Kloss' search of the vehicle did not violate the Fourth Amendment both because Defendant Martinez consented to the search and because there was probable cause to support the search. A search of a vehicle does not violate the Fourth Amendment if it is based on consent or probable cause. <u>Ballard v. Heineman</u>, 548 F.3d 1132, 1135 (8th Cir. 2008).

### 1.      Consent

Defendants argue that the search of the vehicle should be suppressed because Defendant Martinez's consent was not voluntary.  Police officers may search an area without a warrant "if they obtain a voluntary consent from someone possessing adequate authority over the area." United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990) (citing United States v. Matlock, 415 U.S. 164, 171 & n. 7 (1974); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)).  Whether consent to search was voluntary or was the result of duress or coercion is a question of fact to be determined from the totality of the circumstances.  United States v. Arciniega, 569 F.3d 394, 398 (8th Cir. 2009); United States v. Watters, 572 F.3d 479, 483 (8th Cir. 2009).  "In each case, the question is one of mental awareness so that the act of consent was the consensual act of one who knew what he was doing and had reasonable appreciation of the nature and significance of his actions."  Id.; (citing United States v. Castellanos, 518 F.3d 965, 969 (8th Cir. 2008)).  The Fourth Amendment only requires that the officer reasonably believe that an individual has given consent to search.  United States v. Guerrero, 374 F.3d 584, 588 (8th Cir. 2004) (quoting United States v. Sanchez, 156 F.3d 875 878 (8th Cir. 1998)).  The question for a trial court is not whether the defendant subjectively consented to the search but whether a reasonable officer would have believed consent was given.  Guerrero, 374 F.3d at 588.  Awareness of the right to refuse to consent to a search is not necessary for consent to be voluntary.  United States v. Arciniega, 569 F.3d 394, 398 (8th Cir. 2009).

Whether consent was voluntarily given depends on the totality of the circumstances, including the characteristics of the person and the context of the encounter.  Chaidez, 906 F.2d 377, 380 (citing Bustamonte, 412 U.S. at 226).  The Eighth Circuit has identified a number of factors that a court should consider in determining if consent was voluntary:  (1) the individual's

age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of his <u>Miranda</u> rights; (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals; (5) the length of the detention; (6) whether the police used threats, physical intimidation, or punishment to extract consent; (7) whether the police made promises or misrepresentations; (8) whether the individual was in custody or under arrest when consent was given; (9) whether the consent was given in public or in a secluded location; and (10) whether the individual stood by silently or objected to the search. <u>Arciniega</u>, 569 F.3d at 398; <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990). No single factor is dispositive or controlling. <u>United States v. Bradley</u>, 234 F.3d 363, 366 (8th Cir. 2000).

As the driver of the vehicle, Defendant Martinez had adequate authority to consent to the search. At the time Trooper Kloss sought Defendant Martinez's consent to search, neither defendant was under arrest. Rather, Trooper Kloss had specifically advised Defendant Martinez that he was free to leave. The stop was conducted on a public road in full view of other passing vehicles. There is no evidence suggesting Trooper Kloss (or Investigator Reuvers and Sergeant Hunt), threatened, coerced, brandished weapons, or used strong arm tactics on defendants. Defendant Martinez did not attempt to stop the search, nor is there any evidence he appeared to reject the search. There is nothing in the record suggesting Defendant Martinez was under the influence of alcohol or drugs. Although defendants speak Spanish, their interactions with Trooper Kloss indicated they also spoke and understood English. Trooper Kloss even clarified that Defendant Martinez assented to the search when he first answered in Spanish. There is nothing in the record to suggest that Defendant Martinez's consent was coerced or was in any

way not voluntary.  Therefore, Trooper Kloss was entitled to search the vehicle, even without a warrant, and the Court recommends that the motion to suppress be denied.

## 2. Probable Cause and the Automobile Exception

Even if Defendant Martinez had not consented to the search, Trooper Kloss' search of the vehicle would not violate the Fourth Amendment because he had probable cause to believe the vehicle contained contraband and he was entitled to search the vehicle without a warrant under the automobile exception.

With respect to warrantless searches, the Supreme Court has reiterated "the basic rule of Fourth Amendment jurisprudence" as follows:

> The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process without prior approval by judge or magistrate are *per se* unreasonable under the Fourth Amendment– subject only to a few specifically established and well-delineated exceptions.

Horton v. California, 496 U.S. 128, 133 n.4 (1990) (quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978)).  One of these exceptions, the automobile exception, allows police officers to conduct a warrantless search of a vehicle and containers within the vehicle whenever probable cause exists.  California v. Acevedo, 500 U.S. 565, 580, 111 S. Ct. 1982, 1991-92, 114 L. Ed. 2d 619 (1991); United States v. Sample, 136 F.3d 562, 564 (8th Cir. 1998).  Under this rule, police may search a vehicle if they have probable cause to believe that the vehicle contains contraband. United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997) (citing Chambers v. Maroney, 399 U.S. 42, 51, 90 S. Ct. 1975, 1981, 26 L. Ed. 2d 419 (1970)).  In such circumstances, the police may search every part of the car and its contents that may conceal the object of the search.  Id. (citing Acevedo, 500 U.S. at 573-76); United States v. Thompson, 906 F.2d 1292, 1298 (8th Cir.

1990). If probable cause exists to believe a container in the trunk of a car contains contraband, the container may be searched without a warrant. Id.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Nolen, 536 F.3d 834, 839 (8th Cir. 2008); United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir.2000) (citing Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). Under the collective knowledge doctrine, the knowledge of all officers in a team is imputed to a single officer of the team, so long as there is communication between the officers. United States v. v. Thompson, 533 F.3d 964, 970 (8th Cir. 2008) (citing United States v. Banks, 514 F.3d 769, 776 (8th Cir. 2008)).

Courts consider various factors in determining whether information from an informant is sufficiently reliable to establish probable cause. United States v. Buchanan, 574 F.3d 554, 561-62 (8th Cir. 2009). "An informant's tip may be sufficiently reliable to support a probable-cause determination if the informant has previously provided reliable information or if the tip is corroborated by independent evidence." United States v. Leppert, 408 F.3d 1039, 1042 (8th Cir. 2005). Information from an informant is entitled to greater weight when the information includes "the richness and detail of a first hand observation." United States v. Jackson, 898 F.2d 79, 81 (8th Cir. 1990). An informant's tips are also more reliable when they include statements against interest. Buchanan, 574 F.3d at 561 ("[s]tatements against the penal interest of an informant typically carry considerable weight in establishing reliability"). The circumstances of personal questioning may also enhance reliability and credibility. Id. at 562 (citing United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994) (stating the reliability of a tip is increased when an agent meets personally with the informant to assess his credibility)).

A court may consider an informant reliable if the information he or she supplies is "at least partially corroborated" by other sources. Buchanan, 574 F.3d at 562; United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1992); United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993) ("If information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that the informant provides, though uncorroborated, is also reliable."). "Even the corroboration of minor, innocent details can suffice to establish probable cause." Buchanan, 574 F.3d at 562 (quoting United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001)).

The vehicle search was permissible under the Fourth Amendment because the totality of the information known to the officers supported a finding of probable cause. Mr. Sarabia-Ferrel provided officers detailed first-hand information about the car and the car's hidden compartment. He provided additional information to the officers about the owner of the car, the house the car would be located at, when the car was leaving, and the race and number of passengers in the car. Investigator Reuvers and Sergeant Hunt were able to corroborate many of the details provided by Mr. Sarabia-Ferrel, including that Ponce-Ramirez owned the vehicle, the house where the vehicle would be located, the make, model and color of the vehicle, and that the car was driven by two Hispanic males. Additionally, Mr. Sarabia-Ferrel made statements against his penal interest by implicating himself in the drug trafficking scheme. The officers personally questioned Mr. Sarabia-Ferrel and were able to make a first-hand assessment of his credibility. In addition to the detailed information provided by Mr. Sarabia-Ferrel, the conflicting statements by the defendants contributed to the officers' probable cause for the search.

Defendants argue that Mr. Sarabia-Ferrel's information was unreliable because he was "wrong as to the driver, wrong as to the time when the vehicle was possibly leaving, and wrong

both [sic] amount of drugs and amount of monies."  Defendants' suggestion that Mr. Sarabia-Ferrel was "wrong as to the driver" is unclear to the Court.  Investigator Reuvers did not testify that Mr. Sarabia-Ferrel identified who would be driving the vehicle.  Rather the testimony indicates that Mr. Sarabia-Ferrel stated the vehicle would be driven by two or three Hispanic males, which was corroborated.  However, according to Investigator Reuvers, Mr. Sarabia-Ferrel never provided names of who would be driving the vehicle.  Although Mr. Sarabia-Ferrel's statements as to when the vehicle would be leaving may be imprecise, it is not incorrect.  At the time of his arrest in the late hours of July 22, Mr. Sarabia-Ferrel said the vehicle would be leaving "that evening."  While "evening" could suggest before midnight on July 22, it could just as easily refer to the nighttime hours on the 22nd leading to the early hours of July 23.  The Court cannot say Mr. Sarabia-Ferrel was wrong by stating the vehicle would leave the evening of July 22 simply because the vehicle may have left the house after midnight.  Finally, whether Mr. Sarabia-Ferrel was incorrect about the amount of drugs or money in the vehicle is inapposite because that information was determined as a *result* of the search.  Probable cause must be determined at the time of the search.  United States v. Jeanetta, 533 F.3d 651, 654 (8th Cir. 2008).  At the time of the search, the officers did not know how much money or what quantity of drugs were in the vehicle.  The information provided by Mr. Sarabia-Ferrel was sufficiently reliable to support probable cause and the officers were entitled to conduct a search of the vehicle without a warrant pursuant to the automobile exception.

### F.    The Canine Search Was Supported by Probable Cause

After the initial search of the vehicle by Trooper Kloss, officers also completed a canine sniff of the vehicle's exterior and interior.  A canine sniff of the exterior of a vehicle does not constitute a search under the Fourth Amendment and therefore probable cause is not required for

a canine sniff. United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007) (citing United States v. Place, 462 U.S. 696, 707, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983)); United States v. Sanchez, 417 F.3d 971, 976 (8th Cir. 2005). "A canine sniff of the exterior of a car conducted during a traffic stop that is lawful at its inception and otherwise executed in a reasonable matter does not infringe upon a constitutionally protected interest in privacy." United States v. Alexander, 448 F.3d 1014, 1016 (8th Cir. 2006); United States v. Martin, 411 F.3d 998, 1002 (8th Cir.2005). Therefore, an officer only requires reasonable suspicion to conduct a canine search of a vehicle. Linkous, 285 F.3d at 720-21. A canine's alert or identification of drugs in a vehicle provides probable cause that drugs are present and the vehicle can be searched. Hogan, 539 F.3d at 921; Sanchez, 417 F.3d at 976. "[A] dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." Olivera-Mendez, 484 F.3d at 511.

Although the canine sniff of the vehicle's exterior only required reasonable suspicion, as set forth above, the officers had probable cause to believe the vehicle contained evidence or contraband through the information provided by Mr. Sarabia-Ferrel that was later corroborated by law enforcement officers. Once the canine alerted to the doors of the vehicle, there was additional probable cause to conduct the canine sniff of the car's interior. The use of the canine sniff and search did not violate the defendants' Fourth Amendment rights and this Court recommends that the motions to dismiss be denied.

### G.     A Franks Hearing Is Not Required.

After Trooper Kloss' search and after the canine search, law enforcement officers obtained a search warrant for the vehicle. Defendants assert that the evidence seized from the vehicle should be suppressed because the affidavit contained material misstatements.

Essentially, Defendants appear to seek a hearing under <u>Franks v. Delaware</u>, 438 U.S. 154, 155 (1978), on the issue of whether the affiant, who did not testify at the suppression hearing, intentionally misstated relevant facts from the affidavit he provided in support of the search warrant. A request for a <u>Franks</u> hearing is a non-dispositive issue that the Court addresses in the accompanying Order. As set forth in that Order, a <u>Franks</u> hearing is not required because the search warrant is supported by probable cause regardless of the alleged misstatement in the warrant application.

Under <u>Franks</u>, a defendant may challenge in an evidentiary hearing the veracity of a sworn statement used by police to procure a search warrant. <u>Franks</u>, 438 U.S. 154, 155 (1978). To obtain a <u>Franks</u> hearing, the defendant must first make:

> a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

<u>Id.</u> at 155-56. The Court further explained that

> [t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

<u>Id.</u> at 171. But even if these requirements are met, no hearing is required "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause." <u>Id.</u> at 171-72. Thus, in

order to obtain a <u>Franks</u> hearing a defendant must make the substantial preliminary showing that: (1) a false statement was included in the warrant affidavit either (a) intentionally or (b) with reckless disregard for the truth; and (2) the false information was necessary to the finding of probable cause. <u>United States v. Carpenter</u>, 422 F.3d 738, 745 (8th Cir. 2005), <u>cert. denied</u>, 126 S. Ct. 1115 (2006).

As set forth in the accompanying Order, a <u>Franks</u> hearing is not required in this case because none of the alleged false statements were necessary to support a finding of probable cause. The alleged misstatement the defendants rely on is that the search warrant affidavit stated that task force officers opened the hidden compartment in the dashboard and located approximately $10,000 and one pound of methamphetamine before applying for the search warrant. The testimony at the hearing, however, is that the hidden compartment was not opened in the search and methamphetamine and currency were not located in the vehicle at the time of Trooper Kloss' search or the canine search. This fact is not necessary to the finding of probable cause. The search warrant contained the detailed information provided by Mr. Sarabia-Ferrel and what information was corroborated by the officers. The affidavit detailed the surveillance of the house and vehicle as well as, the subsequent traffic stop. The affiant noted the conflicting statements provided by the defendants about their time spent in Minnesota. More significantly, the warrant application described the canine search in which the dog alerted to both the interior and exterior of the vehicle and the officer's identification of the after-market hidden compartment in the dashboard. Even if the alleged misstatement is set aside, all of these details are sufficient to support a finding of probable cause. A <u>Franks</u> hearing is not warranted and the alleged misstatement does not require suppression of the evidence. This Court, therefore, recommends that the motions to suppress be denied.

**H.** **Neither the Defendants Nor the Counts in the Indictment Should Be Severed.**

Pursuant to Federal Rule of Criminal Procedure 14, Defendants move to sever themselves from their co-defendants and to sever the counts in the indictment. Defendants generally allege that: (1) the counts of the indictment are not properly joined under Rule 8(a); (2) the defendants are not properly joined under Rule 8(b); (3) the jury will be unable to distinguish between the alleged actions of the various defendants; (4) that each defendant might introduce evidence that would be inadmissible against the others; and (5) that evidence which would be inadmissible if the counts of the indictment were tried separately will prejudice the defendants. Neither Defendant has filed a supporting memorandum, however, providing any detailed explanation of these general arguments. The Government opposes severance, arguing that the defendants are all charged with conspiracy to distribute and possess methamphetamine, a conspiracy which allegedly involved all the defendants. Therefore, the Government maintains that evidence related to the conspiracy would be presented at trial, regardless of whether there is a joint trial or separate trials.

With respect to joinder of multiple defendants, an indictment may charge two or more defendants "if they are alleged to have participated in the same act or transactions, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). If joinder is proper under Rule 8, the defendant seeking severance has the "heavy burden" of demonstrating that a joint trial will impermissibly infringe his right to a fair trial. United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996). The Supreme Court has repeatedly stated that there is a preference in the federal system for joint trials of defendants who are indicted together because a joint trial promotes efficiency and eliminates the inequity of inconsistent verdicts. Zafiro v. United States, 506 U.S. 534, 536 (1993), cited in United States v. Bradford, 246 F.3d

1107, 1116 (8th Cir. 2001) (overruled on other grounds). Severance is appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539; United States v. Spotted Elk, 548 F.3d 641, 658 (8th Cir. 2008)).

Offenses may be joined in an indictment if they are of similar character, based on the same act, or based on a "common scheme or plan." Fed. R. Crim. P. 8(a). Generally, it is the preferred practice to join all offenses against a defendant. United States v. Dijan, 37 F.3d 398, 402 (8th Cir. 1994) (quoting United States v. Humphreys, 982 F.2d 254, 259 (8th Cir. 1992)). However, "[i]f the joinder of offenses . . . appears to prejudice a defendant or the government, the court may order separate trials of counts." Fed. R. Crim. P. 14(a). It is the defendant's burden to show he will suffer undue prejudice from the joinder of counts. United States v. Darden, 70 F.3d 1507, 1527 (8th Cir. 1995).

In this case, the Indictment charges all the defendants with the same offenses-conspiracy to possess and distribute methamphetamine and aiding and abetting possession with intent to distribute methamphetamine. Absent any specific showing of how a joint trial of all defendants on the same charge would result in prejudice, there is no basis to sever the defendants. Further, the two counts in the Indictment are related and based on the same conspiracy. Defendants have not met their burden of showing they would be prejudiced if the counts in the Indictment are not severed. This Court therefore, recommends that Defendants' motions to sever be denied.

IV.     **RECOMMENDATION**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Martinez Guzman's (01) Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 47] be **DENIED**;

2. Defendant Martinez Guzman's (01) Motion to Sever Counts and Defendants [Doc. No. 49] be **DENIED**;

3. Defendant Martinez Guzman's (01) Motion to Suppress Statements, Admissions, and Answers Made by the Defendant [Doc. No. 50] be **DENIED**;

4. Defendant Medina-Medina's (02) Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 53] be **DENIED**;

5. Defendant Medina-Medina's (02) Motion for Severance of Counts and Defendants [Doc. No. 54] be **DENIED**; and

6. Defendant Medina-Medina's (02) Motion for Severance of Defendants [Doc. No. 68] be **DENIED**.


Dated: November 25, 2009                    s/ Susan Richard Nelson_____
                                            Susan Richard Nelson
                                            U. S. Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by December 10, 2009, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.